WHISTLEBLOWER 21276–13W, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

WHISTLEBLOWER 21277–13W, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 21276–13W, 21277–13W.      Filed June 2, 2015.

P–H was arrested for participating in a conspiracy to launder money. To minimize his punishment, P–H informed Government agents, including Internal Revenue Service (IRS) agents, that a foreign business (Targeted Business) assisted U.S. taxpayers in evading Federal income tax. P–H told the Government agents that the Targeted Business had no presence in the United States and instructed its personnel to stay out of the United States. Although he did not have documentation sufficient to inculpate the Targeted Business, P–H was aware of an individual who did. Because the individual (X) was outside the United States, P–H and P–W designed a plan to induce him to come to the United States. In executing the plan, P–W met with X and persuaded him to enter the United States. Upon entering the United States, X was arrested. While in custody, X agreed to assist the United States in its pursuit of the Targeted Business. After his release, X tried to back out of his agreement. But after meeting with P–H, X agreed to follow through on his commitment. In part because of X's assistance, the Targeted Business was indicted, pleaded guilty, and paid the United States approximately $74 million. Ps filed separate Forms 211, Application for Award for Original Information, with the IRS Whistleblower Office, seeking awards under I.R.C. sec. 7623(b). The forms were filed after the Targeted Business pleaded guilty and paid the United States $74 million. Upon receipt, the IRS sent Ps' Forms 211 to its Ogden, Utah, Service Center, where a classifier noted that the forms were filed after the United States collected proceeds from the Targeted Business. On that basis, the Whistleblower Office rejected Ps' award applications and sent Ps separate award determination letters stating that no proceeds had been collected using the information Ps submitted. The IRS asserts that the Tax Relief and Health Care Act of 2006, Pub. L. No.

109–432, div. A, sec. 406(b), 120 Stat. at 2959 (TRHCA sec. 406(b)), provides the Whistleblower Office with exclusive discretion to either investigate the taxpayer or refer the information provided by the whistleblower to an IRS operating division. The IRS further asserts that under TRHCA sec. 406(b) a whistleblower is ineligible for an I.R.C. sec. 7623(b) award if he/she provides the information to an operating division of the IRS before submitting the information, via a Form 211, to the Whistleblower Office. *Held*: TRHCA sec. 406(b) does not endow the Whistleblower Office with exclusive authority to investigate the individual or entity that is the subject of an application for an award. The fact that Ps supplied their information to other Federal agencies, including an IRS operating division, before submitting the information to the Whistleblower Office on Form 211 does not, as a matter of law, render Ps ineligible for an award under I.R.C. sec. 7623(b).

*Sealed*,[1] for petitioners.
*Richard L. Hatfield*, *John T. Arthur*, and *Jonathan D. Tepper*, for respondent.

OPINION

JACOBS, *Judge*: In these consolidated cases petitioners, husband and wife, seek whistleblower awards authorized by section 7623(b),[2] asserting each brought to the Secretary's attention information which resulted in the collection of unpaid Federal income tax. Petitioners each filed a Form 211, Application for Award for Original Information, with the Internal Revenue Service (IRS) Whistleblower Office (Whistleblower Office) when they learned of the whistleblower award program from one of the Government agents to whom they provided information. The Whistleblower Office summarily rejected each petitioner's claim on the basis that "additional tax, penalties, interest or other proceeds" had been collected before each petitioner filed his/her Form 211. On the basis of its determination that petitioners' claims were untimely, the Whistleblower Officer did not review, investigate, or evaluate the merits of petitioners' claims.

[1] The names of petitioners' counsel have been omitted in furtherance of protecting petitioners' identities.
[2] Unless otherwise indicated, all section references are to the Internal Revenue Code as amended.

The documents in petitioners' administrative files were insufficient for the Court to conduct an effective review of this matter. The only documents in each petitioner's administrative file were (1) the Form 211, (2) an acknowledgment of the receipt of the Form 211 assigning a claim number to the respective petitioner, (3) a letter informing the respective petitioner that his/her claim was still under consideration, (4) a Form 211 Classification Checksheet, and (5) a denial letter stating that the information provided did not result in the collection of proceeds.

The Court held a partial trial at a special session on November 13, 2014, in Washington, D.C., in order to enable the Court to determine (1) what information, disclosure, and/ or action, if any, petitioners provided to employees, agents, and/or officers of the United States in detecting underpayments of tax and/or detecting and bringing to trial and punishment persons guilty of violating the internal revenue laws or conniving at the same and (2) whether that information, disclosure, and/or action satisfies the requirements of section 7623(b). Undisputed facts were revealed at the partial trial and are set forth *infra*.

## *Background*

### I. *Petitioner Husband*

Petitioner husband assisted individuals who were engaged in illegal activities. In 2009 he was arrested at his Florida home, having been indicted as a coconspirator in a conspiracy to launder funds from the sale of pirated musical compact discs. He was taken to a local detention facility. To minimize his punishment, he agreed to cooperate with FBI, IRS, and other Government agents by providing them with information regarding the structure of various entities his clients used in their illegal activities. After spending four weeks in the local detention facility, he was transferred to another facility in Philadelphia, Pennsylvania. In January 2010, petitioner husband pleaded guilty and entered into an agreement with the Department of Justice to provide truthful, complete, and accurate information and testimony. The agreement stated that "[t]he defendant understands that if he testifies untruthfully in any material way he can be pros-

ecuted for perjury" with respect to both his criminal activities and "any other crimes about which he has knowledge."

## II. *The Targeted Business*

While in detention in Philadelphia, petitioner husband informed the Government agents that a foreign business (Targeted Business) assisted U.S. taxpayers in evading Federal income tax. Through his acquaintance with several of the officers of the Targeted Business, petitioner husband became aware that the Targeted Business was organized like a general partnership, with no liability protection for its owners. Petitioner husband believed that were the United States to bring criminal charges against the Targeted Business, its partners would settle in order to avoid the loss of business to the Targeted Business, as well as to avoid personal liability. Petitioner husband told the Government agents that to avoid potential U.S. prosecution the Targeted Business conducted no operations within the United States and instructed its partners, officers, and employees not to come to the United States.

Petitioner husband did not have documentation sufficient to inculpate the Targeted Business, but he was aware of a senior officer of the Targeted Business (X) who did. Petitioner husband believed he could devise a plan to lure X to the United States, and he did.

## III. *X*

Petitioner husband had met X when X was an employee of another entity. X had referred several individuals to petitioner husband for business advice. Eight of the individuals referred to petitioner husband were U.S. taxpayers. X demanded a kickback, ranging from $1,500 to $2,500 per client referral. Petitioner husband resented paying kickbacks to X , but he did so because the amounts he received from the referred clients were substantial.

Petitioner husband believed X would disregard the Targeted Business' admonition not to come to the United States if given sufficient financial motivation. Petitioner husband further believed that if X came to the United States, Federal law enforcement agents could arrest him, and to "save his

own skin" X would provide information which could be used to indict the Targeted Business.

> We were very close, I knew that he is—even that he's a super sports guy and * * * [triathlete]—whatever, he's a weak person. Like, he is not a strong person. He will fold and give up and work with the U.S. government. That's one thing I knew about him. And the other thing I knew about him, that he was very greedy and he was open to kickbacks, obviously, what we introduced here, and that he was very vulnerable to malice. So, when we throw the bone, he will bite the bone. And when we have him, he will, excuse my English, spill his guts.

## IV. *The Plan*

In 2010 petitioners met with U.S. Government agents (including FBI, ICE, and IRS agents), as well as British agents from the Metropolitan Police Service (Met), to formulate a plan to entice X to enter the United States. The plan was based on a transaction petitioners had used for one of petitioner husband's clients and with which X was familiar. X would be told that one of petitioner husband's clients had embezzled funds which were used to purchase an aircraft. As a reward for arranging financing to purchase the plane, petitioner husband "received" $1.2 million. X would be told that petitioners held the $1.2 million in a Bahamian bank account to avoid payment of U.S. tax and that they wanted to move the money into a new bank account which would be held in the name of an "old boarding school friend" of petitioner husband (beneficial owner). The beneficial owner to be introduced to X would, in reality, be a Met agent. X would be told that petitioners wanted him to assist them in transferring the money, and in exchange for that assistance, X would receive $40,000.

## V. *The Sting*

Petitioner husband was involved in the drafting of all paperwork required to make it appear that an aircraft had been purchased with financed money. He then contacted X, and told him petitioners were in a dire situation and that it was imperative for them to meet. X was told to meet petitioner wife in England because petitioner husband could not travel internationally after his arrest. X knew, but apparently was not concerned, about petitioner husband's arrest. X had met petitioner wife previously, and he trusted her.

In February 2010 petitioner wife flew to England to meet X. Agreeing to meet X was difficult for petitioner wife, especially because her husband's arrest had taken its toll on their marriage.

> I was about 20 pounds less. I was scared. I was nervous. * * * It was obviously very important that I do a good job. So, I had to fly by myself. Agents didn't fly with me, so I went to * * *. Obviously, I was in very bad shape, because I had to deal with * * * [petitioner husband's arrest] situation.

Petitioner wife arrived in England the day before her scheduled meeting with X. She met with Federal agents who, after checking her hotel room for "bugs", discussed her upcoming meeting with X. After speaking with the agents, she walked with them to the meeting place, a popular hotel lounge. Petitioner wife was informed that approximately 10 American and British agents would be in the lounge during the meeting. Petitioner wife and the agents next went to the U.S. Embassy, where she was instructed to leave the lounge if she believed something was amiss. Petitioner wife spent the remainder of the day rehearsing what she would say to X. Specifically, she needed to explain how the plan would work, state that the $1.2 million came from embezzled money and that petitioners had not paid tax on that money, tell X about the beneficial owner, and make arrangements for X to meet the beneficial owner at another meeting.

On the morning of the meeting, the Federal agents attached a recording device to petitioner wife and placed a backup recorder in her purse. Petitioner wife then went to the lounge and waited for X to arrive. When X arrived 10 to 15 minutes later, he and petitioner wife conversed in a foreign language. Over the course of an hour, petitioner wife was able to complete her talking points and record the incriminating conversation. After the meeting, petitioner wife flew to Philadelphia and spent several days reviewing the English translation of the transcript of her conversation with X to ensure accuracy.

For several weeks no one heard from X. The Government agents began to be concerned that, as petitioner husband put it, X "got totally cold feet." By this point, the Government agents had come to trust petitioner husband. Petitioner husband's passport was returned to him, and he flew, alone, to

the Cayman Islands to meet X in order to "rein him back in". Petitioner husband and X met, and X agreed to meet the beneficial owner.

Petitioner wife again traveled to England to meet X. She followed the same procedure as in the first meeting. The same two types of recording devices were planted on her, and she met X at the same lounge as in the first meeting.

Petitioner wife entered contact information with respect to the beneficial owner in her cellular telephone before her second meeting with X because

> the plan was that I arrive a little early, have a little warmup talk with * * * [X], and then I would get a phone call from * * * [the beneficial owner] and I would say "Oh, he's coming," and even show it in the phone and, you know, make it very real.

When the would-be beneficial owner arrived, he and X had an immediate rapport. The beneficial owner's backstory had been designed to appeal to X's interests. Importantly, both the beneficial owner and X were triathletes. X mentioned that a triathlon in the Bahamas was upcoming and that he and the beneficial owner should compete together. They ultimately discussed the movement of the $1.2 million to a new bank account, the fact that the $1.2 million came from embezzled money, and that petitioners had not paid tax on it.

Unfortunately, neither the recording device worn by petitioner wife nor the one in her purse worked; therefore, the incriminating conversation with X was not recorded. Consequently, over a period of two months, petitioner husband called X in an effort to get him to make incriminating statements. Eventually, petitioner husband got two recordings in which X discussed the fact that the $1.2 million came from embezzled money, that petitioners had not paid tax on it, and that X would assist in the movement of the $1.2 million to a new bank account. Petitioner husband was concerned that X would realize something was amiss, given the efforts made to convince him to say certain things (i.e., "embezzlement" and "untaxed"), but petitioner husband's fears proved unfounded.

The next step was to draw X to the United States. Since X had been instructed by the Targeted Business to avoid entering the United States, a certain amount of enticement

was necessary. Petitioner husband contacted X and convinced him to fly to Florida to meet the beneficial owner before traveling to the triathlon in the Bahamas. He told X that the beneficial owner would give him $15,000 in cash as a downpayment when they met. X agreed to fly to Florida where he was arrested.

After a week in custody, X agreed to assist the Government agents in their pursuit of the Targeted Business. X's arrest was kept quiet so as not to alert the Targeted Business; eventually he was released and permitted to return abroad. Upon his return, X informed one of the Targeted Business' owners that he had been arrested in the United States and that he needed help. When the Government agents learned of X's betrayal, they directed petitioner husband to convince X to follow through on his commitment.

Petitioner husband persuaded X to meet him. Petitioner husband appealed to X's avariciousness by telling him that their meeting was necessary to resolve a number of issues with clients that affected payments to be made to X. Their meeting was tense. Petitioner husband bluntly laid out X's situation. He told X that if he did not cooperate with U.S. authorities, he would be unable to travel internationally for the rest of his life, because "as soon as you jump over the water, they get you." Petitioner husband used himself as an example of the benefits of cooperation. He explained that the Government agents kept their word, and he warned X that "[i]f you screw them, you're screwed". Ultimately X agreed to cooperate with the Federal authorities.

After X began cooperating with the Government agents, a U.S. attorney's office opened a criminal investigation of the Targeted Business. Often when X provided prosecutors with information, petitioner husband would be asked to confirm its accuracy. During this time petitioner husband met the assistant U.S. attorney leading the case, along with FBI and IRS agents, to discuss the organization and operation of the Targeted Business.

The Targeted Business was indicted, with a subsequent superseding indictment, for conspiring with U.S. taxpayers and others to hide more than $1.2 billion in secret accounts, and the income generated therefrom, from the IRS. The Targeted Business pleaded guilty, as petitioner husband pre-

dicted. As part of its guilty plea, the Targeted Business paid the United States approximately $74 million.

Petitioner husband received an email from the lead FBI agent stating "GREAT JOB" with a copy of the indictment attached. Another agent called petitioners to congratulate them. In an attachment to the stipulation of facts filed with this Court, both the lead FBI agent and the assistant U.S. attorney leading the case against the Targeted Business were effusive in their praise of both petitioners, stating:

> The assistance and support of * * * [petitioners] in supporting the investigation was exceptionally helpful * * * In short, but for the work, information, and effort of * * * [petitioners] in assisting the federal government, the government's successful action against * * * [the Targeted Business], as it was carried out, would not have been possible. * * * The information provided by the whistleblower [sic] was essential and substantially contributed to the government's actions against * * * [the Targeted Business] that led to the collection of $74,131,694.42.

The IRS was involved in the pursuit of the Targeted Business from the beginning of the investigation. At the partial trial before this Court, the IRS special agent involved in the investigation of the Targeted Business testified that petitioner husband's cooperation had been essential and the agent acknowledged that there was no "Plan B" for the IRS to pursue the Targeted Business.

## VI. *Petitioners' Claims for Award*

Petitioners were unaware of any whistleblower award program when they began to assist the Government in its pursuit of the Targeted Business. During one of petitioner husband's meetings with FBI, ICE, and IRS agents, one of the agents mentioned that the IRS had a whistleblower award program. Petitioner husband's attorney contacted several of the agents involved, inquiring whether they would object to petitioners' filing claims for award. No one objected to the filing of such claims.

On or about April 16, 2013, petitioners each submitted a Form 211 to the Whistleblower Office. The Whistleblower Office mailed petitioners separate letters on May 7, 2013, notifying them that their Forms 211 had been received and were assigned claim numbers. On or about June 17, 2013, the Whistleblower Office sent petitioners separate letters

stating that their claims remained open and were under active consideration.

Upon receipt, petitioners' Forms 211 were sent to the IRS Service Center in Ogden, Utah, for processing. Upon arrival, a Form 211 is reviewed by a clerk who verifies the taxpayer's name and the whistleblower's name, address, and Social Security number and confirms that it includes an original signature. The form is then entered into the system and forwarded to a "classifier" to analyze the whistleblower's allegations and determine whether the application should be accepted for substantive review by an operating division of the IRS or rejected summarily. In the instant matter, the classifier noted that proceeds had been collected from the Targeted Business before petitioners filed their respective Forms 211. On that basis, the classifier rejected petitioners' applications. The classifier sent a Form 211 Classification Checksheet for each petitioner's claim to Cindy Wilde, a team manager in the IRS Ogden Service center. The checksheet includes a number of unexplained coded categories. The checksheet stated: "Foreign [entity]—no US tax returns filed—claim is based on information previously provided to US Justice Dept which resulted in settlement agreement in US District court case–claim was filed after the settlement was reached and is therefore ineligible for reward". The checksheet then stated "Results from Classification: L–1010", which was the code instructing the IRS to send rejection letters to petitioners. The checksheet did not explain the rationale for the conclusion stated.

Upon receipt of the Form 211 Classification Checklist, Ms. Wilde noted the L–1010 designation and directed a clerk to generate award determination letters denying petitioners' claims. She did not review any other portion of the checklist. Identical letters to petitioners stated:

> We have considered your application for an award dated 04/10/2013. Under Internal Revenue Code Section 7623, an award may be paid only if the information provided results in the collection of additional tax, penalties, interest or other proceeds. In this case, the information you provided did not result in the collection of any proceeds. Therefore, you are not eligible for an award.

> Although the information you submitted did not qualify for an award, thank you for your interests in the administration of the internal revenue laws.

If you have any further questions in regards to this letter, please feel free to contact the Informant Claims Examination Team at 801–620– 2169.

The letters did not address the facts and circumstances of petitioners' applications or mention the perceived timing issue. Indeed, apart from the date, each letter consisted of boilerplate language taken from an example letter in the Internal Revenue Manual. No further action was taken by the Whistleblower Office.[3]

On or about August 13, 2013, the IRS sent petitioners the separate award determination letters denying their respective claims for award. Petitioners appealed those determinations to this Court, pursuant to section 7623(b)(4), on September 12, 2013.

## *Discussion*

### I. *Introduction*

The only issue we decide herein is whether petitioners were required as a matter of law to file Forms 211 with the Whistleblower Office before providing information to the IRS to qualify for an award under section 7623(b). We hold they were not.

### II. *Rejection of Petitioners' Requests for Award as Untimely*

#### A. *Respondent's Argument*

Petitioners filed their respective Forms 211 three months after the Targeted Business pleaded guilty. According to respondent, information petitioners gave to the IRS special agent before filing their Forms 211 is not "information brought to the Secretary's attention" (whistleblower information) for which petitioners can receive awards under section 7623(b). Respondent concedes that section 7623(b) does not specifically include a timing requirement regarding when

---

[3] Generally a Form 11369, Confidential Evaluation Report on Claim for Award, is included in the administrative file. The form is prepared for the Whistleblower Office by the IRS operating division that reviews the application and allows the Whistleblower Office to evaluate the merits of the claim before making a final determination. Because petitioners' applications were rejected on the grounds that the Forms 211 were filed late, no such review was made, no Form 11369 was generated, and no Whistleblower Office analyst reviewed the claim.

whistleblower information must be submitted to the Whistleblower Office. But citing the Tax Relief and Health Care Act of 2006, Pub. L. No. 109–432, div. A, sec. 406(b), 120 Stat. at 2959 (TRHCA sec. 406), which established the Whistleblower Office, respondent argues that the Whistleblower Office is the "gatekeeper of information for purposes of nondiscretionary awards under amended section 7623(b)." And respondent asserts that to be eligible for an award under section 7623(b), an individual must submit the whistleblower information to the Whistleblower Office on Form 211 before any IRS action or examination is carried out with respect to that information.

B. *Whistleblower Statute Background*

Before its amendment in 2006, section 7623 authorized the Secretary to pay "such sums as he deems necessary for—(1) detecting underpayments of tax, and (2) detecting and bringing to trial and punishment persons guilty of violating the internal revenue laws or conniving at the same". The regulations promulgated thereunder provided that IRS district and/or service center directors have authority to approve awards "in a suitable amount, for information that leads to the detection of underpayments of tax, or the detection and bringing to trial and punishment of persons guilty of violating the internal revenue laws or conniving at the same." Sec. 301.7623–1(a), Proced. & Admin. Regs. The regulations further provided that the "amount of a reward will represent what the district or service center director deems to be adequate compensation in the particular case." *Id.* para. (c); *see* Michelle M. Kwon, "Whistling Dixie About the IRS Whistleblower Program Thanks to the IRC Confidentiality Restrictions", 29 Va. Tax Rev. 447, 452 (2010).

In 2006 the Treasury Inspector General for Tax Administration (TIGTA) reviewed the whistleblower award program and filed a report entitled "Treasury Inspector General for Tax Administration Report 2006–30–092, The Informants' Reward Program Needs More Centralized Management Oversight (June 2006)" (TIGTA Report). The TIGTA Report found that the whistleblower award program had significantly contributed to the IRS' enforcement efforts and that examinations based on informant information were often more effective and efficient than examinations initiated using

the IRS' primary method for selecting returns for examination. TIGTA Report at 1–2. However, the TIGTA Report found that the whistleblower award program was weakened by lack of standardized procedures and managerial oversight. Specifically, the TIGTA Report stated there was no national database of informant claims (instead there were five regional databases, one for each of the five regional units), and 45% of the case files reviewed suffered basic control failures, such as missing copies of forms and missing records of letters sent to informants. The TIGTA Report further stated that TIGTA was unable to determine (1) the justification for the percentage amount awarded to the informants in 32% of the cases reviewed and (2) the rationale for the decision to reject the informant's claim in 76% of the cases reviewed.

The TIGTA Report found that the whistleblower award program was replete with lengthy delays, averaging 7½ years for an award to be paid to an informant. *Id.* at 2. The TIGTA Report concluded that while part of this delay was a result of the statute's requirement that rewards be paid only after the additional taxes, fines, and penalties had been collected, the IRS failed to monitor taxpayers' accounts for payment activity for periods longer than a year. The TIGTA Report further concluded that award rejections took an inordinate amount of time, and TIGTA could not determine the reason for delays between the receipt of the whistleblower's claim and review thereof. *Id.* at 8–9.

The TIGTA Report made two primary recommendations: first, that the IRS centralize management of the whistleblower award program and standardize processing of award claims; and second, that a detailed nationwide database of informant claims be developed and implemented. *Id.* at 9.

C. *The 2006 Amendment and Section 7623(b)*

In 2006 Congress enacted TRHCA to strengthen the IRS whistleblower award program. TRHCA sec. 406(b), an uncodified provision, established the IRS Whistleblower Office to administer the whistleblower award program. TRHCA sec. 406(b) provides:

(1) IN GENERAL.—Not later than the date which is 12 months after the date of the enactment of this Act, the Secretary of the Treasury shall issue guidance for the operation of a whistleblower program to be

administered in the Internal Revenue Service by an office to be known as the "Whistleblower Office" which—

(A) shall at all times operate at the direction of the Commissioner of Internal Revenue and coordinate and consult with other divisions in the Internal Revenue Service as directed by the Commissioner of Internal Revenue,

(B) shall analyze information received from any individual described in section 7623(b) of the Internal Revenue Code of 1986 and either investigate the matter itself or assign it to the appropriate Internal Revenue Service office, and

(C) in its sole discretion, may ask for additional assistance from such individual or any legal representative of such individual.

(2) REQUEST FOR ASSISTANCE.—The guidance issued under paragraph (1) shall specify that any assistance requested under paragraph (1)(C) shall be under the direction and control of the Whistleblower Office or the office assigned to investigate the matter under paragraph (1)(A). No individual or legal representative whose assistance is so requested may by reason of such request represent himself or herself as an employee of the Federal Government.

## D. *Analysis*

Respondent argues the statutory provisions make clear that Congress intended the Whistleblower Office to serve as the gatekeeper of whistleblower information. According to respondent, the Whistleblower Office is able to maintain the discretion granted it by TRHCA sec. 406(b)(1)(B) to investigate the matter or assign it to an appropriate IRS office only if the whistleblower information is first provided to it. Similarly, respondent maintains that the discretion granted to the Whistleblower Office by TRHCA sec. 406(b)(1)(C) to ask for assistance from the whistleblower would be jeopardized if it did not first receive the information. Respondent posits that this interpretation is consistent with the conclusions of the TIGTA Report emphasizing the need for centralized management of the whistleblower award program.

Respondent's position does not survive close scrutiny. As the TIGTA Report noted, audits under the old whistleblower award program were effective; it was the process by which awards were issued that was problematic. TRHCA sec. 406 addresses this problem. It is clear from the statute that the Whistleblower Office is charged with being the central office for investigating the legitimacy of a whistleblower's award claim, not necessarily the underlying tax issue. To interpret TRHCA sec. 406(b)(1)(B) as respondent does would mean the Whistleblower Office is authorized to open an examination

relating to a taxpayer. But the Whistleblower Office has neither sufficient staff nor institutional expertise to investigate taxpayers. *See* Internal Revenue Manual pt. 1.1.26.1 and 1.1.26.2 (June 8, 2010) (discussing the roles and mission of the Whistleblower Office). And were the Whistleblower Office to expand its staff and expertise sufficiently to conduct examinations relating to taxpayers brought to its attention by whistleblowers, such expansion would duplicate the resources already available in IRS operating divisions.

Moreover, if the Whistleblower Office opened an examination relating to a taxpayer, such an examination would alert the taxpayer that an informant was involved and this would potentially subject the whistleblower to exposure and retaliation, directly contravening the IRS policy of protecting the identities of informants. And we are loath to interpret a statute in a manner that leads to an absurd result. *See, e.g.*, *United States v. Granderson*, 511 U.S. 39, 47 n.5 (1994); *In re Chapman*, 166 U.S. 661, 667 (1897).

IRS auditors do not shy away from directly contacting whistleblowers when in need of assistance. *See, e.g.*, *Whistleblower 10949–13W v. Commissioner*, T.C. Memo. 2014–106, at \*3. Tellingly, at the partial trial of these cases, the IRS agent testified that he would not suspend his investigation to permit whistleblowers to file forms with the Whistleblower Office.

Despite respondent's assertions, we are mindful that the Forms 211 which petitioners filed anticipate that a whistleblower may approach an operating division of the IRS before notifying the Whistleblower Office. See Form 211, line 8, which instructs the whistleblower to provide the "Name & Title of IRS employee to whom violation was reported", and line 9, which asks for the "Date violation reported".

Form 211 was revised in March 2014. It was not, and never has been, altered to discourage whistleblowers from approaching an operating division of the IRS. To the contrary, revised Form 211 expands the detail about a whistleblower's directly contacting investigating agencies before contacting the Whistleblower Office, including providing space for the whistleblower to report any information submitted to other Federal agencies as well as State authorities. See Form 211, line 5, which instructs the whistleblower to provide the "[n]ame and title and contact information of IRS employee to

whom violation was first reported, if known". See also line 6, which instructs the whistleblower to provide "[d]ate violation reported (in number 5), if applicable". And line 7 asks: "Did you submit this information to other Federal or State Agencies"? And line 8, which states: "If yes in number 7, list the Agency Name and date submitted". If respondent's position were correct, these lines would be superfluous; in fact, they would be misleading to an unwary whistleblower.

Respondent also argues that the Whistleblower Office must first receive a whistleblower's information in order to permit Form 11369 to be filled out. Respondent maintains:

> The Form 11369 is the key document used by the Whistleblower Office in making the determinations required by section 7623 and only is created on a contemporaneous basis when information is referred by the Whistleblower Office. Thus, allowing individuals to file an award claim based on information previously submitted to a different function of the IRS would circumvent the centralized oversight and management of the program that was mandated by congress when section 7623(b) was enacted and undermine the Whistleblower Office's ability to make well-supported determinations.

In considering respondent's argument, we have reviewed Form 11369. The form allows an IRS operating division to inform the Whistleblower Office of each issue raised by the whistleblower, the disposition of that issue (i.e., whether the issue was pursued), and the level of assistance the whistleblower provided. Upon examination of the form, we do not believe it must be completed contemporaneously with a taxpayer-related examination. There is no reason for the contact information provided by Form 211 lines 5 and 6, other than for it to be used by the Whistleblower Office to contact the IRS employee who received the whistleblower information. And there is no reason for the Whistleblower Office to contact the IRS employee except when evaluating the whistleblower's claim.

Finally, even if respondent's contention that the Whistleblower Office is authorized by TRHCA sec. 406 to conduct examinations relating to taxpayers is correct, the statute does not mandate that a whistleblower first bring his/her information to the Whistleblower Office to be eligible for an award. TRHCA sec. 406(b)(B) provides only that the Whistleblower Office shall "analyze information received" and "either investigate the matter itself or assign it to the appro-

priate Internal Revenue Service office." The statute makes no mention of the Whistleblower Office's being the first IRS office to receive information, and, as a practical matter, nothing prevents the Whistleblower Office from pursuing the whistleblower's information even after another IRS office receives it.

III. *Conclusion*

On November 5, 2014, respondent filed a motion in limine, requesting the Court to confine its review to the issue of timing. Respondent asserts that the Court should apply an abuse of discretion standard of review and, if the Court finds the Whistleblower Office improperly denied petitioners' claims for award on the basis that the claims were untimely submitted, the cases should be remanded to the Whistleblower Office for further consideration. The parties did not fully explore the standard of review to be used in whistleblower cases. And because it is not necessary for us to address the standard of review in resolving the timing issue, we will not do so. Respondent's motion in limine will be denied.

Because it rejected petitioners' claims as untimely, the Whistleblower Office did not conduct a review, investigation, or evaluation of the merits of petitioners' claims for award. We believe the parties should have an opportunity to resolve these cases on the basis of our holding herein. We will require them to file a status report in accordance with an order to be issued.

In the light of the foregoing,

*An appropriate order will be issued.*